Joseph C. Novak v. Commissioner.
Novak v. Commissioner
Docket No. 72649.
United States Tax Court
T.C. Memo 1960-138; 1960 Tax Ct. Memo LEXIS 151; 19 T.C.M. (CCH) 717; T.C.M. (RIA) 60138; June 29, 1960
*151 Held, that certain payments made by the petitioner over the period 1927 to 1930 to his father in Austria did not give rise to debts within the meaning of section 166 of the Internal Revenue Code of 1954, and therefore the deduction claimed by the petitioner for a bad debt in 1956 was properly disallowed. Held, further, that the petitioner is not entitled to an exemption for his wife under section 151 of such Code, he having filed a separate individual income tax return and she having gross income; and that since the petitioner was married at the close of his taxable year, he is not entitled to the special tax rate provided by section 1(b) of the Code for the head of a household. Joseph C. Novak, pro se, 1638 Pilgrim Ave., New York, N. Y. Herbert Rothenberg, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, *153 Judge: The respondent determined a deficiency in income tax of $987.40 for the taxable year 1956. The principal issue is whether the petitioner is entitled to a bad debt deduction of $3,431. Another issue is whether petitioner is entitled to a personal exemption of $600 for his wife or whether he is entitled to use rates applicable to a head of a household. Findings of Fact The petitioner is an individual with residence in New York City. He filed an individual income tax return for the year 1956 with the district director of internal revenue for the southern district of New York. During World War I petitioner was a resident and citizen of Vienna, Austria. After the war, due to postwar inflation, the petitioner's father, who was a railroad engineer, lost all his savings. Nevertheless, he helped the petitioner to finish his studies in engineering. At that time the petitioner resolved that if he ever made sufficient money he would help his father build a house. The petitioner came to the United States in 1924. On January 10, 1927, the petitioner sent his father a check for $1,000 and on August 15, 1927, he sent him another check for $200. The proceeds of these two checks were *154 used by the petitioner's father to purchase a lot. On November 9, 1929, petitioner sent his father a check for $250 and on June 21, 1930, he sent another check for $1,981. The proceeds of these checks were used by petitioner's father in the construction of a 2-family brick home. In 1928 the petitioner returned to Austria and saw this lot, but at that time the house had not been built. The total amount which the petitioner sent his father, $3,431, amounted to 23,000 schillings. At the time these funds were sent the petitioner received no instrument in writing evidencing indebtedness, and there was no provision for the payment of interest. It was the petitioner's hope to get the money back if there should come a time that his father did not need the money any longer, or at the death of his father. The father always had the hope that the petitioner would return and eventually take over the property, but by 1930 the petitioner was sure that he would never go back permanently. The construction of the home was financed primarily by an agency of the Austrian government, which loaned petitioner's father 64,600 schillings and took back a first mortgage dated May 13, 1930. Later the petitioner's *155 father also obtained in connection with the construction a bank loan in the amount of 6,500 schillings, which loan was recorded. The petitioner's father did not invest any of his own funds in the home since he had lost all his savings, although he did considerable work in construction of the house. The upper floor of the home was rented and the plan was to pay off the first mortgage with the rental. On December 12, 1937, the petitioner's father wrote the petitioner a letter stating: "I have the intention to send you a document of debt made out by a notariatslawyer in the sum of 23,000 schilling, so that you have something in your hands and don't have to pay taxes on your own money. This is the cheapest way and it would be a legal document." Thereafter, the petitioner's father had a second mortgage drawn, dated July 11, 1938, which he sent to the petitioner. At that time Germany had already invaded Austria. In such instrument the petitioner's father acknowledged that he had received from his son a sum of 16,666.66 Reichsmark "and therefore I am in debt to the 'creditor' for the above mentioned sum." He therein guaranteed to pay "this debt to the creditor on December 31, 1948 at *156 his legal residence." He therein stated that he was "obligated to repay to the creditor the debt and interest in the full present value * * * so that the creditor shall under no circumstances have any loss due to possible devaluation of the Reichsmark." It was further provided that if the debtor could not fulfill his financial obligation and bankruptcy proceedings should be started against him, or if the property should be wholly or partially transferred during his lifetime, or in the case of the death of the debtor, the creditor should be entitled to start court proceedings to recover the debt. At or about the time the petitioner received this second mortgage he received a letter from his father stating that "The year 48 as liquidation of the loan is also a matter of form, as a liquidation date has to be set in this document." The petitioner's father retired a few years after he built the house and received a pension which was no more than sufficient to provide living expenses. He died in 1943, but the petitioner had no knowledge thereof until 1946. Petitioner's sister had the estate settled in the Austrian courts in 1943, a distant relative having been appointed to act for the *157 petitioner. Pursuant to Austrian law the petitioner and his sister each received a 3/8th interest and the petitioner's mother received a 1/4th interest in the property. Petitioner's mother died in 1947 and thereupon the petitioner and his sister each became the owner of a 1/2 interest in the property. The Austrian courts held that the mortgage obligation should be divided between petitioner's one-half and his sister's one-half interest in the property, and that the mortgage on petitioner's one-half interest was automatically canceled, pursuant to Austrian law, as petitioner could not be his own debtor. The petitioner then initiated a court action in Austria, through a representative, to foreclose the mortgage on his sister's share of the property. After protracted litigation the Austrian courts finally held on July 11, 1956, that the petitioner was required to accept the amount of 8,333.33 schillings, plus interest from December 31, 1948, as full payment, that he was required to cancel the mortgage on his sister's share of the estate, and that he should refund to his sister the cost of the proceedings and his sister's attorneys' fees, totaling 7,025.71 schillings. The petitioner *158 had engaged a lawyer to represent him, and had paid a retainer of 1,000 schillings in 1948 or 1949. Thereafter the lawyer took, in part payment of his fee, the excess of the Austrian judgment over the amount of 7,025.71 schillings required to pay the sister's legal fees and the court costs. The amount which petitioner's lawyer received at that time was between 1,500 and 2,000 schillings. There remained an amount to be paid to the lawyer, and this was paid in 1959. The petitioner received no payment as a result of the Austrian litigation. Since the death of the petitioner's parents his sister has resided on the first floor of the house in question and the second floor has been rented. During the court of litigation the Austrian courts required the petitioner's sister to file a financial accounting with respect to the property. Therein she reported a loss from the operation. The petitioner has not since 1956 received any financial statement as to the rental income from the property in which he has a 50 per cent interest. At some time about 1953 the petitioner, through a representative in Austria, offered to accept from his sister an amount of $2,500 for his interest in the property *159 and in settlement of the mortgage, but she refused. Further attempts were made to obtain a buyer for the petitioner's interest in the property but without success. The advances totaling $3,431 made by the petitioner to his father did not give rise to debts owing to the petitioner. The petitioner filed a separate income tax return for the year 1956. His wife refused to sign a joint return with him for that year. She had income of approximately $100 during the year 1956. The petitioner furnished the support for his wife. In his return the petitioner claimed three exemptions, one of these being for his wife, and one for his daughter. Opinion The first question is whether the petitioner is entitled to a bad debt deduction in 1956 pursuant to section 166 of the Internal Revenue Code of 1954. [1]
*160 It is well established that deductions are a matter of legislative grace and that a taxpayer seeking a deduction must clearly show that he comes within the deduction provisions of the state. New Colonial Ice Company v. Helvering, 292 U.S. 435. It has often been held that among the prerequisites for a bad debt deduction is a clear showing that the parties intended to create a debtor-creditor status and that in fact a debt was created. Est. of Carr V. Van Anda, 12 T.C. 1158, aff'd per curiam (C.A. 2), 192 F. 2d 391, and Evans Clark, 18 T.C. 780, aff'd per curiam (C.A. 2), 205 F. 2d 353. There must be an unconditional obligation to pay, that is, the amount claimed as a debt must be certainly and in all events payable. Bercaw v. Commissioner (C.A. 4), 165 F. 2d 521, affirming a Memorandum Opinion of this Court; and William Francis Mercil, 24 T.C. 1150. We have taken the position that proof of the intention or agreement must consist of acts or declarations substantially contemporaneous with the event; subsequent acts or declarations being ineffective to change the nature of the transaction. *161 Jacob Grossman, 9 B.T.A. 643. In the Clark case we pointed out that intra-family transactions are subject to rigid scrutiny and that there must be an affirmative showing that there existed at the time of the transaction a real expectation of a repayment and an intent to enforce collection. And in the Van Anda case we held that the giving of a note or other evidence of indebtedness which may be legally enforceable is not in itself conclusive evidence of a bona fide debt - taking the position that in that case the advance of money by a husband to his wife was more in the nature of a contingent gift. In the instant case the petitioner sent a total of $3,431 to his father in Austria over the period 1927 to 1930, but did not in that period obtain any evidence of indebtedness from his father, despite the fact that he made a visit to Austria in 1928. From the record as a whole, including the petitioner's testimony, [2] we think that at the time the petitioner advanced the money he did not intend or expect his father to make repayment of the money in question. In the first place, it appears that the petitioner sent the money primarily out of gratitude to his father for having *162 assisted him in getting an education, and in this respect the advances partake of the nature of gifts or repayments to his father. The petitioner himself testified that he did not expect to receive repayment unless his father became financially able. This was only a remote possibility since the father had lost all his savings, his salary or pension as a railroad engineer appears to have been no more than sufficient to pay the family expenses and any rent from the upper floor of the home would have to be used to pay the first mortgage. The father's expectation, according to petitioner's testimony, was that the petitioner would return to Austria and eventually take over the property. It seems clear that the only reasonable expectation which the petitioner had was that he would acquire the property, or an interest therein, at the time of his father's death. It was not until 1938, when Austria had been invaded by Germany, that the petitioner's father executed a second mortgage on the property in favor of his son. Such mortgage calls for payment in 1948, but the petitioner testified that it was not his intention for the father to pay at that time and that he would have extended it as long *163 as his father was alive. Actually, the outcome of the transaction appears, to some extent at least, to have been as originally anticipated by the petitioner in that he did receive a one-half interest in the property upon his father's death. It may well be, as the petitioner contends, that the property had little or no value to him, but we think this is not decisive here. It is our conclusion that the advances by the petitioner to his father *164 were not made with such an intention or expectation of repayment as to render them debts within the meaning of the statute, and that the respondent did not err in disallowing the claimed bad debt deduction. The petitioner filed a separate individual income tax return for 1956 (his wife refusing to enter into a joint return) and therein claimed as a deduction an exemption on account of his wife, which was disallowed by the respondent. The petitioner contends that he is entitled to an exemption for his wife because he furnished her sole support and because, he states on brief but without supporting evidence, his wife did not file a return. Section 151 of the Internal Revenue Code of 1954 provides in part: "(a) Allowance of Deductions. - In the case of an individual, the exemptions provided by this section shall be allowed as deductions in computing taxable income. "(b) Taxpayer and Spouse. - An exemption of $600 for the taxpayer; and an additional exemption of $600 for the spouse of the taxpayer if a separate return is made by the taxpayer, and if the spouse, for the calendar year in which the taxable year of the taxpayer begins, has no gross income and *165 is not the dependent of another taxpayer." Section 1.151-1(2)(b) of the Income Tax Regulations provides in part that "Thus, a husband is not entitled to an exemption for his wife on his separate return for the taxable year beginning in a calendar year during which she has any gross income (though insufficient to require her to file a return)." We consider this is a reasonable interpretation of section 151(b) of the Code. The evidence shows that the petitioner's wife had gross income in 1956 of approximately $100. Thus, irrespective of whether petitioner furnished her support and whether she filed a separate return, it is clear that under section 151(b) the petitioner is not entitled to an exemption for her. Nor is he entitled to an exemption for her as a dependent under section 151(e) since section 152(a)(9) of the 1954 Code, as amended retroactively by sections 1 and 4 of the Technical Amendments Act of 1958, in defining the word "dependent," specifically excludes the spouse of the taxpayer. We approve the respondent's disallowance of the claimed deduction. The petitioner contends in the alternative that he is entitled to the special tax rate provided *166 by section 1(b) of the Internal Revenue Code of 1954 for every individual who is the head of a household, since, he claims, he maintained a home in which he supported a minor daughter and his wife. Section 1(b)(2) provides that an individual shall be considered a head of a household if, and only if, such individual is not married at the close of his taxpayer year, is not a surviving spouse * * *" and also meets other specified requirements. Here the petitioner was married at the close of his taxpayer year, and, therefore, is not entitled to the special rate provided by section 1(b). The petitioner has requested that "the lawyer fees of my own lawyer in Austria in this court proceedings of the loan (or second mortgage) be declared deductible, so that I will not have to go through this tax dispute again." At the hearing it developed that the petitioner had reference to the remaining attorneys' fees which he stated amounted to $300 to $350 and which he testified he paid in 1959 and intended to claim as a deduction for that year. Obviously, of course, we cannot consider this question, since the only year properly before us is the year 1956. In his return for 1956 *167 the petitioner did not claim a deduction on account of attorneys' fees paid in 1956 and is not now making such claim. Decision will be entered for the respondent. Footnotes
1. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.↩
2. The petitioner testified on cross-examination in part as follows: Q. Was it your intention initially, if you went back to Vienna, that your parents would continue to live in the house? A. No. I have to go further back than that. After the First World War, inflation came, my father lost every penny he had in the bank, and he still let me finish my study years to become an engineer, and I promised myself if I ever get some money, I will help him to build a house. Q. I see. So you were really repaying your father for the education he had given you? A. Yes and no - to a certain extent, I hoped to get the money back if my father didn't need it any more, or at my father's death. Q. Or at your father's death? A. That is correct.↩